## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **R.B.,** *a Minor, by and through her Parent,* **Plaintiff,** **v.** **MASTERY CHARTER SCHOOL,** *and* **THE SCHOOL DISTRICT OF PHILADELPHIA** **Defendants.** | : : : : : : : : : : : : : : : | **CIVIL ACTION** **NO. 2:10-cv-06722** |

## MEMORANDUM OPINION AND ORDER

**RUFE, J.**                                                    **DECEMBER 29, 2010**

On November 17, 2010 Plaintiff R.B., acting through her mother ("Parent"), brought this action against Mastery Charter School ("Mastery") and The School District of Pennsylvania ("District"), appealing the decision of a Due Process Hearing Officer who refused to return R.B. to Mastery during the pendency of due process hearings conducted pursuant to the Individuals with Disabilities Education Act ("IDEA"). Presently before the Court is Plaintiff's Motion for a Mandatory Stay-Put Injunction,[1] and the District and Mastery's separate Motions to Dismiss Plaintiff's complaint pursuant to 12(b)(1) and (6).[2] Having considered the parties' arguments fully, and the evidence and testimony adduced at a hearing before this Court on December 16th and 17th, 2010, and for the reasons stated below, the Court enters the following Memorandum and accompanying Order.

---

[1] doc. no. 1.

[2] doc. nos. 15, 16.

# I. BACKGROUND

A.    FACTUAL BACKGROUND[3]

R.B. is a 19-year-old female diagnosed with Trisomy 21 (Down's Syndrome), who

currently lives with her mother in Philadelphia, Pennsylvania.[4] She qualifies for special education

services under the IDEA[5] because the results of educational, cognitive, and functional assessments

identify her as a student with mild to moderate retardation.  According to her most recent

Individualized Education Plan ("IEP")—which is outdated by two years—R.B.'s academic level of

functioning ranges between a second to third grade instructional level.[6]  In addition to her cognitive

---

[3] This background summary references exhibits submitted by the parties, without regard to the Federal Rules of Evidence, or any written objection entered by either party on the basis thereof—unless the Court specifically ruled otherwise during the December 16th and 17th hearing.  As the Third Circuit recognized in Kos Pharma., Inc. v. Andrx Corp., 369 F.3d 700, "[a]ffidavits and other hearsay materials are often received in preliminary injunction proceedings."  Id. at 718 (internal citation & quotation omitted).  Therefore, district courts may exercise their discretion in "weighing all attendant factors, including the need for expedition, to assess whether, and to what extent, affidavits or other hearsay materials are appropriate given the character and objectives of the injunctive proceeding." (internal quotation omitted) (citing Asseo v. Pan Am. Grain Col., 805 F.2d 23, 26 (1st Cir. 1986)).  Courts have consistently held that the Federal Rules of Evidence do not apply at preliminary injunction hearings.  See, e.g., Heideman v. South Salt Lake City, 348 F.3d 1182, 1188 (10th Cir. 2003); United States v. O'Brien, 836 F. Supp. 438, 441 (S.D. Ohio 1993).  Accordingly, at the preliminary injunction stage, a court may rely on hearsay evidence that would not be admissible at trial.  In the absence of any guidance regarding the appropriate evidentiary standards to impose at a "stay-put" injunction hearing, this Court adopts the standards governing preliminary injunctions.  Therefore, Plaintiff's written objections based upon relevancy, lack of foundation, and hearsay are overruled.  See Pl.'s Addendum to Exs. (doc. no. 17).

[4] Pl. Ex. 10 (District Student Eval. Rep., March 5, 2001).

[5] The IDEA was originally enacted as the Education of the Handicapped Act, Title VI of Pub.L. 91-230, 84 Stat. 175, and was renamed the Individuals with Disabilities Education Act in 1990.  See § 901(a)(3), Pub.L. 101-476, 104 Stat. 1142.

[6] An IEP is an educational plan tailored to a child's unique needs by the school district, in consultation with the child's parents, teachers, and related service specialists after the child is identified as eligible for special-education services.  See 20 U.S.C. §§1412(a)(4), 1414(d).

disabilities, R.B. also has physical impairments that impede her ability to function independently in the general classroom environment: she was born with a congenital heart defect and underwent open heart surgery to repair a ventral-septal defect before the age of two, has "hypermobile joints," a heart murmur, soft palate, and sleep apnea.[7]  R.B.'s cognitive and physical disabilities substantially impede her ability to participate in the general classroom setting, and according to numerous IEPs and Evaluation Reports, she has received support from Therapeutic Support Staff (TSS)[8], and one-to-one academic aides[9] throughout her academic career.

R.B. attended her designated "neighborhood school," the District's Pickett School, from 2005 until 2007, when Mastery took over management of the school.  Although students are typically required to participate in a lottery to gain admittance to Mastery, neighborhood students already attending Pickett—including R.B.—automatically became students of Mastery.  After Mastery took over Pickett, responsibility for implementing R.B.'s special education program transferred from the District to Mastery.

The Mastery IEP team developed two IEPs for R.B.  The first Mastery IEP, dated November 2, 2007, provided a one-to-one aide for R.B.[10]  Daniel Kurtz, who was responsible for supervising the implementation of R.B.'s educational program at the time the 2007 IEP was developed, testified that the IEP team provided the aide solely because of "the school district's

---

[7] Pl. Ex. 25 (District Re-evaluation Report, June 7, 2006).

[8] Pl. Ex. 10; Pl. Ex. 9 (District I.E.P, November 6, 2006); Pl. Ex. 11 (District Occupational Therapy Assessment, Feb. 28, 2006); Pl. Ex. 25; Pl. Ex. 26 (Mastery Charter School IEP, Nov. 2, 2007).

[9] Pl. Ex. 9; Pl. Ex. 26.

[10] Pl. Ex. 26 at 18.

obligation to provide a one-to-one, based on what their IEP said was a court order."[11] Kurtz further

testified that R.B.'s IEP team did not believe that R.B. showed a need for one-to-one academic

assistance.[12] Therefore, R.B's 2008 IEP did not include a one-to-one aide as a related service.[13] It

is unclear whether a one-to-one academic aide ever actually provided support to R.B. while she

attended Mastery,[14] and Parent contends she assumed the responsibility for providing the aide, and

occasionally served as R.B.'s aide in the classroom and elsewhere due to staffing and cost

considerations.[15]

Although it was not documented in either Mastery IEP, while R.B. attended Mastery, she

received individual support from a TSS, who, among other responsibilities, monitored R.B.'s

health issues, assisted R.B. to and from school, helped her transition between classes, and helped

---

[11] Hr'g Tr. 177, Dec. 16, 2010. In unrelated litigation, R.B., by her Parent, reached a settlement agreement with the School District of Philadelphia, wherein the School District of Philadelphia agreed to provide R.B. with a one-to-one aide. Because the settlement agreement is confidential, and the details of the prior litigation irrelevant to the pending matter, this Court's discussion of the settlement is limited to Mastery's argument that the settlement relieved it of the obligation to provide a one-to-one aide to R.B.

[12] Hr'g Tr. 14, Dec. 17, 2010.

[13] Pl. Ex. 8 (Mastery IEP, October 23, 2008).

[14] Mr. Kurtz testified that Mastery was not responsible for providing the one-to-one aide for R.B: "[I]n a document that wasn't included, there's a notice of recommended educational placement ["NOREP"], which enacts the IEP, and that [NOREP] specifies and was signed by [Parent] that the one-to-one aide would be provided by the School District of Philadelphia . . . . In a conversation with [Parent], I made it clear that she would have to work with the district in terms of staffing for that position, because it was a school district position." Hr'g Tr. 178.

[15] Mot. for Mandatory IDEA Stay-Put Inj. at 3; see also Hr'g Tr. 32, Dec. 16, 2010 (Parent testified that "Mastery always allowed me to come in. There were many times that I came in and I assisted R.B. in the classroom. If we had a TSS that was running late or absent for that day, for the entire school year I played the role of the one on one assistant.").

her copy text from the chalkboard into her notes.[16]  Parent testified that TSS workers were unreliable, and that when they were absent, she would escort R.B. to school, situate her in the classroom, and sometimes assist her in the classroom throughout the school day.[17]  Although Mastery's personnel controverted Parent's assertion that she was permitted to remain in the classroom during the day, all agreed that Parent would regularly escort R.B. to and situate her in her first class.[18]

The record also shows that Mastery accommodated R.B.'s health needs by modifying its strict attendance policy requirements.[19]  Parent testified that R.B.'s sleep apena, in combination with her heart condition, made it impossible for her to consistently wake up by the beginning of school, and caused her to miss school frequently.[20]  Because of the variability of R.B.'s attendance and her medical needs, until April 2009, Mastery did not record attendance for R.B., nor did they

---

[16] Hr'g Tr. 23, 33, 22, Dec. 16, 2010 (Parent testified that R.B. is unable to cross the street by herself).

[17] Mr. Kurtz testified that he could only recall two occasions when R.B. spent the day without her Mother or the TSS worker.  Hr'g Tr. 21, Dec. 17, 2010.

[18] Hr'g Tr. 21, Dec. 17, 2010 (Mr. Kurtz testified that "The extent of [Parent's] support would be bringing her to school.  She would escort her to her first class at which point typically she might have a short conversation with the teacher, a short conversation with myself and then she would leave the school."); Hr'g Tr. 91, Dec. 17, 2010 (Ms. Haynes, R.B.'s former Special Education teacher, testified that although she never saw Parent act as an aide for R.B. during her class, she did observe Parent escort R.B. to class.).

[19] Mastery presented substantial evidence about their truancy and absenteeism policy, as recorded in their charter, student handbook, and "whatever it takes" contract, which each student is required to sign upon enrollment.  See Def. Ex. 4 at 18.  The contract specifies that if a student is absent more then six days in one semester, she may lose academic credit and states that "Mastery does not permit 'excused' absences.'"

[20] Hr'g Tr. 35–37, Dec. 16, 2010.  R.B.'s attendance record reflects a history of extensive absenteeism and tardiness.  From 1998 to 2007, R.B.'s excused and unexcused absences ranged from twenty-one to sixty-nine, and she was also frequently marked "late."  Once Mastery assumed control of Pickett, however, R.B.'s school records record neither late arrivals nor absences.  Pl. Ex. 28.

pursue standard truancy protocols in response to R.B.'s frequent absences.[21]

In March 2009, a conflict developed between Mastery and Parent after Parent brought R.B. to school earlier then usual, and had difficulty locating R.B.'s classroom. Ms. Seaton, the principal of Mastery, testified that when Parent entered the building, she refused to sign in and then disrupted an ongoing class and a faculty meeting.[22] After the incident, on March 6, 2009, Ms. Seaton sent Parent a letter limiting Parent's entry into Mastery, informing her that she was "no longer welcome to enter our building unless [she had] a scheduled appointment with an administrator."[23] Parent interpreted the letter as a no-trespass notice, which made it impossible for her to transport R.B. to school and situate her in the classroom, and thus prevented R.B. from attending school. Soon after receiving the letter, Parent stopped bringing R.B. to school.

Emails between Mastery personnel indicate that on April 28, 2009, Mastery—for the first time—began to mark R.B. absent.[24] Although it is unclear what prompted the change in Mastery attendance procedures for R.B., a May 12 email about how to "code" R.B's attendance noted concerns that Parent's "decision to keep [R.B.] out of school due to legal action [was] hurting our attendance figures."[25] On June 19, 2009, after sending three written communications to the parent,

---

[21] Pl. Ex. S-33 (April 18, 2009 e-mail between Mastery staff noting that R.B. is "always counted as present due to a medical issue").

[22] Hr'g Tr. 65, Dec. 17, 2010.

[23] Pl. Ex. 2 at 1.

[24] Pl. Ex. S-36.

[25] Pl. Ex. S-40 at 2 (May 12, 2009 email between Mastery staff).

and pursuant to Pennsylvania State Law,[26] Mastery unilaterally dropped R.B. from enrollment. There is no evidence that Mastery provided Parent with a copy of the Procedural Safeguards for special education students, attempted to convene a meeting of R.B.'s IEP team, or considered whether or not R.B.'s absences were a manifestation of her disability prior to dropping R.B. from the rolls. Since the disenrollment was unilateral, it occurred without the informed consent of Parent.

R.B. has not been in school—nor has she received any special education services—since this dispute arose in March 2009. She is now nineteen years old, and will only qualify for special education services until age twenty-one.

B.    Procedural History

On April 16, 2009, Parent, acting *pro se*, made her first attempt to initiate legal proceedings by filing a complaint against the District and Mastery in the Eastern District of Philadelphia.[27] Her complaint was dismissed on August 28, 2009 due to procedural deficiencies.[28] Just under a year later, on March 29, 2010, Parent filed a Complaint and a Request for a Preliminary Injunction and Temporary Restraining Order against Mastery and the District in the Philadelphia Court of

---

[26] Under 22 Pa. Code § 11.24, a school must drop from enrollment any student who has ten consecutive days of absence.

[27] R.B. v. The Sch. Dist. of Phila., et al., no. 09-cv-1627 (doc. no. 3) (On April 16, Parent entered a Motion to Proceed In Forma Pauperis (doc. no. 1); she did not enter her Complaint until May 13, 2009 (doc. no. 3)) (Parent's first complaint sought "action against the School District of Philadelphia and the Mastery Charter school for the violation of my daughter, [R.B.'s] civil rights, as well as . . . violation of FAPE," and stated that "[t]he nature of my daughter's disability makes it impossible for her to go to school unaccompanied.").

[28] Id. (doc. no. 12) (granting Defendant Mastery and the District's Motion to Dismiss as unopposed). The court did not conduct a hearing in this matter, nor did it rule on the merits of this case. Parent also filed a complaint with Office for Civil Rights, which was dismissed on June 26, 2009 because the same issue was the subject of a pending litigation. Pl. Ex. 6.

Common Pleas.[29]  The Court dismissed her request after R.B.'s former counsel failed to appear at the hearing, and upon finding that the Plaintiff had failed to establish service of the Complaint.

On October 5, 2010, Parent filed a Complaint for Due Process in the Pennsylvania Office for Dispute Resolution against Mastery and the District.  After both Defendants moved to dismiss the complaints, the Hearing Officer asked Parent to respond and asked the parties to brief the issue of where R.B. belonged (or should "stay-put") during the pendency of the administrative proceedings.  Parent and the District argued that Mastery was the appropriate stay-put placement for R.B.  On November 1, 2010, the Hearing Officer declined to determine R.B's stay-put placement until the underlying Due Process complaint was resolved, finding that "there was no operative placement actually functioning at the time this dispute first arose," and that the "legitimacy of the Student's disenrollment is a mixed question of fact and law that cannot be resolved before the hearing."[30]

On November 17, 2010, Parent, on behalf of R.B., appealing the Hearing Officer's refusal to issue a stay-put order during the pendency of these proceedings by filing this Complaint and pending Motion for a Stay-Put Injunction in this Court.  Both Defendants subsequently moved to dismiss the complaint.  On December 16th and 17th, this Court conducted an evidentiary hearing and has now reviewed the testimony, arguments, evidence, and governing law.  All Motions are no ripe for disposition.

_____

[29] R.B. v. Master Charter School, No. 100305421 (Mar. 29, 2010) (Ct. Com. Pl. Phila.) Mar. 29, 2010).

[30] Pl.'s Ex. 1 (Order Regarding Pendency, The District's Mot. to Dismiss, and Mastery's Mot. to Dismiss, ODR No. 01632/10-11 JS & ODR No. 01633/10-11 JS (Nov. 1, 2010)).  On December 1, 2010, the Due Process Officer convened its first administrative hearing.  The due process proceedings did not conclude that day, and the hearing has been continued to 2011.

C.    LEGAL BACKGROUND

In 1970, Congress enacted the IDEA to ensure that "all children with disabilities are provided a 'free appropriate public education which emphasizes special education and related services designed to meet their unique needs [and] to assure that the rights of [such] children and their parents or guardians are protected.'"[31]   "[T]he primary vehicle for implementing these congressional goals" is the IEP,[32] which describes the child's present educational and functional performance, establishes annual goals for improvements in that performance, and "describes the specially designed instruction and services that will enable the child to meet those objectives."[33]  In addition to the protections offered by the IEP, Congress also included procedural safeguards within the IDEA that allow parents and students to challenge a local educational agency's decisions through administrative proceedings.[34]  Pennsylvania has adopted a two-tier special education administrative hearing system that consists of an evidentiary hearing at the local level before a single impartial hearing officer, followed by an independent review at the "state" level before a panel of three impartial appellate officers.[35]

During the pendency of judicial or administrative proceedings, §1415(j) of the IDEA—commonly referred to as the "stay-put" provision—mandates that "unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current

---

[31] Forest Grove Sch. Dist. v. T.A., 129 S. Ct. 2484, 2491 (U.S. 2009) (quoting Sch. Comm. of Burlington v. Dep't of Educ. of Mass., 471 U.S. 259, 367 (1985)).

[32] Honig v. Doe, 484 U.S. 305, 311 (1988); see also 20 U.S.C. § 1414(d)(1)(A).

[33] See Honig, 484 U.S. at 311; 20 U.S.C. § 1414(d)(1)(A)(i)(I)–(VI).

[34] 20 U.S.C.A. § 1415; 22 Pa. Code §§ 15.8, 16.63.

[35] See 22 Pa. Code § 14.64(m).

educational placement."[36]  Under this provision "all handicapped children, regardless of whether their case is meritorious or not, are to remain in their current educational placement until the dispute with regard to their placement is ultimately resolved."[37]

1.  *Charter Schools and the IDEA*

The IDEA conditions the grant of federal education funding upon the requirement that states provide a "free appropriate public education" (FAPE) to children who are identified with one or more of thirteen specific disabilities.[38]  State Educational Agencies fulfill the federal mandate by ensuring that each local educational agency ("LEA") complies with IDEA.[39]  Each LEA has an affirmative obligation to identify and serve appropriately all eligible children with disabilities within its jurisdiction.

Under Pennsylvania's statutory scheme, charter schools are independent LEAs and "assume the duty to ensure that a FAPE is available to a 'child with a disability' in compliance with IDEA and its implementing regulations."[40]  Under this scheme, Mastery Charter School bears full responsibility for providing special education services to students with disabilities.

---

[36] 20 U.S.C.A § 1415(j); 22 Pa. Code § 16.63(a).

[37] Drinker by Drinker v. Colonial Sch. Dist., 78 F.3d 859, 864–65 (3d Cir. 1996).

[38] 20 U.S.C. § 1412(a)(1).

[39] 20 U.S.C. § 1401(19) ("The term 'local education agency' means a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary schools or secondary schools in a city, county, township, school district, or other political subdivision of a State, or for such combination of school districts or counties as are recognized in a state as an administrative agency for its public elementary schools or secondary schools.").

[40] 22 Pa. Code § 711.3; see also 34 C.F.R. § 300.209(c) ("If the public charter school is an LEA, consistent with § 300.28 . . . that charter school is responsible for ensuring that the requirements of this part are met, unless State law assigns that responsibility to some other entity.").

## III. DISCUSSION

A.  THE SCHOOL DISTRICT'S 12(b)(6) MOTION TO DISMISS

A complaint can be dismissed for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6) if the plaintiff has not presented "'enough facts to raise a reasonable expectation that discovery will reveal evidence' of [a] necessary element."[41]  A court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine, whether under any reasonable reading of the complaint, the plaintiff may be entitled to relief."[42]  However, Plaintiffs' "bald assertions" or "legal conclusions" need not be accepted as true by the court.[43]  At this stage, the court does not determine whether the non-moving party will prevail, but whether it will be permitted to offer evidence in support of the claims in the complaint.[44]

This particular pleading standard, described in Federal Rule of Civil Procedure 8(a)(2) as "a short and plain statement of the claim showing that the pleader is entitled to relief"[45] has been addressed twice by the Supreme Court of the United States in recent years, first in Bell Atlantic

---

[41] Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556 (2007)).

[42] Id. at 233.

[43] In Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1429–30 (3d Cir. 1997).

[44] Fay v. Muhlenberg Coll., No. 07-4516, 2008 WL 205227 at *4 (E.D. Pa. Jan. 23, 2008) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

[45] Fed. R. Civ. P. 8(a)(2).

Corp. v. Twombly[46] and then in Ashcroft v. Iqbal.[47]  The Court in Twombly articulated a "plausibility" standard that a plaintiff must meet by its factual allegations to survive a motion to dismiss.[48]  The Court described it as a level higher than suspicion or speculation.[49]  The Iqbal Court clarified that "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"[50]

During the proceedings on December 16, 2010, the Court granted the School District's Motion to Dismiss Plaintiff's Motion for failure to state a claim upon which relief can be granted.[51]  Although the Complaint names the School District as a defendant, it does not seek any relief from the school district.  Similarly Plaintiff's Motion for a Mandatory IDEA Stay-Put Injunction does not seek relief against the School District; plaintiff seeks an order that Mastery is R.B.'s "stay-put" educational placement during the pendency of proceedings.  Indeed, Plaintiff conceded that "based on our presentation of evidence we have not presented a case against the School District of Philadelphia."[52]  Because the complaint makes no claims against the School District, its Motion to

---

[46] 550 U.S. 544 (2007).

[47] 129 S. Ct. 1937 (U.S. 2009).

[48] Twombly, 550 U.S. at 556.

[49] Id. at 555.  The decision in Twombly retired the previous standard articulated in Conley v. Gibson, 355 U.S. 41 (1957), allowing dismissal if it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley, 355 U.S. at 45-46.

[50] Iqbal, 129 S. Ct. at 1950 (quoting Fed. R. Civ. P. 8(a)(2)).

[51] Hr'g Tr. 96, Dec. 16, 2010.

[52] Id.

Dismiss for failure to state a claim is hereby GRANTED.

B.    Jurisdiction

The School District and Mastery both move to dismiss the Complaint pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction because Parent did not exhaust her administrative remedies.[53]

Although this Court has jurisdiction to hear disputes arising under the IDEA pursuant to 20 U.S.C. § 1415(i)(3)(A), before an aggrieved individual may bring an action in state or federal court for a violation of the IDEA, they typically must seek recourse from the administrative procedures established by the statute.[54]  Ordinarily, the plaintiff's failure to exhaust administrative remedies deprives the court of subject matter jurisdiction over any IDEA claims.[55]  Here, Parent has not exhausted her administrative remedies: the hearing officer's decision was issued prior to the commencement of any due process hearing on the merits of this case, which has been continued until January 2011.

But the exhaustion requirement is not an inflexible rule.  In enacting IDEA;

"Congress specified that exhaustion is not necessary if (1) it would be futile to resort to the IDEA's due process procedures; (2) an agency has adopted a policy or pursued a practice of general applicability that is contrary to the law; or (3) it is impossible that adequate relief can be obtained by obtained by pursuing

---

[53] Resp. of Def. Sch. Dist. of Phila. to Pl.'s Mot. for Prelim. Inj. (doc. no. 9).

[54] See 20 U.S.C. § 1415(i)(2) (establishing the exhaustion requirement for actions brought pursuant to IDEA); see also  Murphy v. Arlington Cent. Sch. Dist. Bd. Educ, 297 F.3d 195, 199 (2d. Cir. 2002) (Sotamayor, J.).

[55] See W.B. v. Matula, 67 F.3d 484, 493 (3d Cir. 1995) (overruled on other grounds by A.W. v. Jersey City Pub. Sch., 486 F.3d 791, 793 (3d Cir. 2007) (noting that the failure to exhaust administrative remedies is jurisdictional in nature).

administrative remedies."[56]

The Plaintiff "bear[s] the burden of showing that [she] should be permitted to avoid the administrative procedures."[57] Here—noting that Pennsylvania administrative due process hearings can take "well over a school year," and citing specific Pennsylvania due process cases as evidence—Plaintiff persuasively argues that it is impossible to obtain adequate relief from violations of § 1415(j) through the administrative process.[58]

Although the exhaustion requirement applies to challenges to a proposed IEP, many courts have recognized that it does not apply to an action to establish a child's pendent placement under the stay-put provision.[59] For example, the Ninth Circuit has concluded that "exhausting the

---

[56] Murphy, 297 F.3d at 199 (quoting H.R. Rep. No. 296, 99th Cong., 1st Sess. 7 (1985)); see also Beth V. by Yvonne V. v. Carroll, 87 F.3d 80, 88–89 (3d Cir. 1996) (noting the same exceptions to administrative exhaustion requirements).

[57] Blunt v. Lower Merion Sch. Dist., 559 F. Supp. 2d 548, 558 (E.D. Pa. 2008) (citing Doe v. Ariz. Dept. of Educ., 111 F.3d 678, 681 (9th Cir. 1997).

[58] Pl.'s Opp. to Def.'s Mot. to Dismiss, at 7 (doc. no. 18).

[59] See, e.g., Murphy, 297 F.3d at 199–200; Digre v. Roseville Schs. Indep. Dist., 841 F.2d 245, 250 (8th Cir. 1988) (holding federal courts have authority to enter injunctions regarding placement during pendency of state administrative proceedings); M.K. v. Roselle Park Bd. of Educ., No. 06-4499, 2006 WL 3193915, *9 (D.N.J. Oct. 31, 2006) ("The weight of authority indicates that district courts have the power to review and enjoin ALJ stay-put orders immediately, notwithstanding the fact that they are interim orders."); Matthew K. v. Parkland Sch. Dist., No. 97-6636, 1998 WL 84009, at *2 (E.D. Pa. Feb. 26, 1998) (holding that a pendency determination is appropriate prior to the exhaustion of administrative remedies, even if an ultimate decision regarding appropriate permanent placement would be premature); see also Termine v. William S. Hart Union High Sch. Dist., 219 F. Supp. 2d 1049, 1052 (C.D. Cal. 2002) ("[A]n action seeking a 'stay put' enforcement pursuant to section 1415(j) can be brought directly in this court without any previous administrative determination."); Henry v. Sch. Admin. Unit 29, 70 F. Supp. 2d 52, 57 (D.N.H. 1999) (holding that parents came within futility exception to requirement that they exhaust administrative remedies before pursuing stay-put claim in federal court); Cole v. Metro. Gov't, 954 F. Supp. 1214, 1221 (M.D. Tenn. 1997) (the stay-put provision "would be of little benefit if the plaintiffs are forced to proceed with administrative remedies in order to apply it"); Carl B. v. Mundelei High Sch. Dist. 120 Bd. of Ed., No. 93-C-5304, 1993 WL 787899, at *2 (N.D. Ill. 1993) ("If the stay-put provision applies in this case, it is being violated each day [the student] is not in the program . . . . There is no administrative remedy for this violation . . . . This would mean that [the student] would be deprived

administrative process would be inadequate because the stay-put provision (and therefore the preliminary injunction) is designed precisely to prevent harm while the proceeding is ongoing."[60] Similarly, in Murphy v. Arlington Central School District Board of Education, then-Judge Sotamayor held that "[t]he administrative process is 'inadequate' to remedy violations of § 1415(j) because, given the time-sensitive nature of the IDEA's stay-put provision, 'an immediate appeal is necessary to give realistic protection to the claimed right.'"[61] Because "[a] belated administrative decision upholding a student's stay put rights provides no remedy for the disruption already suffered by the student . . . as a practical matter, access to immediate interim relief is essential for the vindication of this particular IDEA right."[62]  That conclusion is consistent with the principle that the exhaustion requirement does not apply to stay-put injunctions because the purpose of the stay put is to prevent disruption during proceedings to exhaust.  The Supreme Court has relied on this principle in explaining that both parents and school officials could seek injunctive relief to enforce or alter the pendent placement of a child under the stay-put provision.[63]

Although the Third Circuit has not addressed the issue, the reasoning behind courts' rejection of the exhaustion requirement in this context is persuasive.  Because we find that "access to immediate interim relief is essential for the vindication of this particular IDEA right," this Court

---

of the benefits of the stay-put provision entirely.").

[60] See, e.g., N.D. v. Hawaii Dept. of Educ, 600 F.3d 1104, 1111 (9th Cir. 2010) .

[61] Murphy, 297 F.3d at 199 (quoting Miss Am. Org. v. Mattel, Inc., 945 F.2d 536, 545 (2d Cir. 1991)).

[62] Murphy, 297 F.3d at 199–200.

[63] Honig, 484 U.S. at 326–27 (noting that because "parents may bypass the administrative process where exhaustion would be futile or inadequate . . . we have no reason to believe that Congress meant to require schools alone to exhaust in all cases, no matter how exigent the circumstances").

has subject matter jurisdiction over this matter.[64]  Accordingly, the 12(b)(1) motions of both

Mastery and the District will be denied.

C.    THE STAY-PUT PROVISION

1.    *Legal Standard*

The stay-put provision represents Congress's "policy choice" that "the danger of excluding

a handicapped child entitled to an educational placement from that placement was much greater

than the harm of allowing a child not entitled to an educational placement to remain in that

placement during the pendency of judicial proceedings."[65]  Accordingly, the stay-put provision

"protect[s] handicapped children and their parents during the review process," by "block[ing]

school districts from effecting unilateral change in a child's educational program."[66]  The stay-put

provision functions, "in essence, as an automatic preliminary injunction" by directing that "during

the pendency of any proceedings conducted pursuant to this section . . . the child *shall* remain in

the then-current educational placement of the child."[67]

Although Plaintiff need not meet the traditional preliminary injunction standard,[68] an

---

[64] Murphy, 297 F.3d at 200.

[65] Cronin v. Bd. of Educ., 689 F. Supp. 197, 202 (S.D.N.Y. 1988)

[66] Susquenita Sch. Dist. v. Raelee S., 96 F.3d 78, 82, 83 (3d Cir. 1996).

[67] 20 U.S.C.A. § 1415(j).

[68] Drinker, 78 F.3d at 864 (quoting Woods v. New Jersey Dep't of Educ., No. 93-5123, 20 Indiv. Disabilities Educ. L. Rep. 439, 440 (3d Cir. Sept. 17, 1993)); Honig, 484 U.S. at 323.
    Citing L.Y. v. Bayonne Bd. of Educ., 384 F. App'x. 58 (3d Cir. 2010), Mastery argues that "it is clear the preliminary injunction standard is to be applied in considering a request for a preliminary injunction under the IDEA's stay-put provision."  But L.Y. does not support Mastery's claim; there, the Third Circuit considered the four-factor preliminary injunction standard because the Plaintiff sought—as alternative relief to issuance of a stay-put injunction—a preliminary injunction.  Id. at 59.  Contrary to Mastery's argument, it is well-established that the Drinker standard governs stay-put injunctions.  See,

injunction under the stay-put provision is only available where the LEA proposes or effects a change in a student's "educational placement."[69]  Therefore, the threshold question is whether Mastery's decision to disenroll R.B. constitutes a change in educational placement.  If R.B.'s disenrollment is not a change in educational placement within the meaning of the IDEA, then Mastery was free to disenroll R.B.  If, however, R.B.'s disenrollment was a change-in-placement, Mastery is obligated to permit R.B. to remain in her "then-current educational placement."  Therefore, if Parent shows that a change in placement has occurred, this Court's narrow inquiry is limited to identifying the proper stay-put placement.[70]

    2.    *Change in Educational Placement*

 Although neither the text nor legislative history of IDEA defines the phrase " change in educational placement," the Third Circuit "gives the term . . . an 'expansive reading.'"[71]  Because the "touchstone" inquiry is "whether the decision is likely to affect in some significant way the

_____

e.g., Pardini v. Allegheny Intermediate Unit, 420 F.3d 181, 188 (3d Cir. 2005) ("[T]he District Court's error was compounded (or perhaps facilitated) by its reliance upon an analysis more appropriately utilized for ruling upon preliminary injunctions than enforcing the Act's stay-put rule."); Michael C. & Stephen C. v. Radnor Twnshp. Sch. Dist., 202 F.3d 642, 651 (3d Cir. 2000) (noting that the Drinker standard governs motions for stay-put injunctions); Drinker, 78 F.3d at 864–65; W.R & K.R. v. Union Beach Bd. of Educ., No. 09-2268, 2009 WL 4042715, at *4 (D.N.J. Nov. 19, 2009); K.T. v. West Orange Bd. of Educ., No. 01-3208, 2001 WL 1715787, at *2 (D.N.J. Oct. 23, 2001) ("[T]he traditional standards a district court normally considers in conjunction with the issuance or denial of a preliminary injunction-likelihood of success on the merits, balance of hardship, etc.—are inapposite to an application involving IDEA's 'stay put' provisions.").

   [69] Union Beach Bd. of Educ., 2009 WL 4042715, at * 4.

   [70] Drinker, 78 F.3d at 864 ("[o]nce a court ascertains the student's current educational placement, the movants are entitled to an order"); see also Pardini 420 F.3d at 188 (3d Cir. 2005).

   [71] DeLeon v. Susquehanna Cmty. Sch. Dist., 747 F.2d 149, 153 (3d Cir. 1984) (specifying that an "expansive reading" is particularly appropriate where "changes affecting only an individual child's program are at issue").

child's learning experience,"[72] Plaintiff must "identify, at a minimum, a fundamental change in, or elimination of a basic element of the education program."[73]  Under this approach, "'identifying a change in . . . placement is something of an exact science,'" and "is, necessarily, fact specific."[74]

Although there are no reported judicial decisions considering whether a public school's unilateral disenrollment of special education students is a change in placement, there is a substantial body of case law analyzing whether the modification or termination of an educational program constitutes a "fundamental change" or "elimination."[75]  Those cases distinguish between inconsequential modifications in a student's program and those which "significantly affect the child's learning experience."[76]  Unlike program modifications, which change an aspect of a child's special education program, eliminations result in the complete cessation of the delivery of special

---

[72]  Id. (holding that when transportation by a parent is replaced with transportation by a stranger, it does not have a significant effect on the child's learning experience).

[73]  Roselle Park Bd. of Educ., 2006 WL 3193915, at *10 (citing Lunceford v. Dist. of Columbia Bd. of Educ., 745 F.2d 1577, 1582 (D.C. Cir. 1984).

[74]  Id. at 153.

[75]  At least two administrative courts have considered the exact question presented under these facts and concluded that the unilateral disenrollment of a special education student is a change in placement that triggers the stay-put provision.  See In Geraldo and the Springfield Pub. Schs., No. 06-4908 (Commw. of Mass. Bureau of Special Educ. Appeals, Jun. 18, 2007), available at www.doe.mass.edu/bsea/decisions/06-4908_06-5863.doc; In the Matter of Parent, On Behalf of Student v. Camptonville Acad., OAH Case No. 2008090659 (Off. of Admin. H'gs, State of Ca., March 18, 2009), available at http://www.documents.dgs.ca.gov/oah/seho_decisions/2008090659.pdf).

[76]  See, e.g., DeLeon, 747 F.2d at 154; (change in the method of transporting a seriously handicapped child to a special education facility is not a change in educational placement); Union Beach Bd. of Educ., 2009 WL 4042715, at *4 ("one-to-one instruction as opposed to a small group resource room does not constitute a 'fundamental change, or elimination of' [the student's] educational placement").

education services.  Courts have found indefinite expulsions,[77] graduation,[78] and transfers from a

school outside the district to those within the district[79] all implicate the stay-put rule.

Here, Plaintiff argues that Mastery twice changed R.B.'s placement.  First, Parent asserts

that when Mastery "banned" her from coming to its campus, she was no longer able to act as a one-

to-one aide for R.B.  In Parent's view, that change eliminated a crucial related service necessary for

R.B. to function in the classroom and constituted a "fundamental change."  Second, Parent argues

more compellingly that Mastery terminated R.B.'s educational placement by unilaterally

disenrolling her on June 19, 2009.[80]

In response, Mastery argues that "there has been no change in this student' [sic] program or

placement," and claims that the true issue here "is not program or placement under the IDEA, but

truancy."[81]  Citing Pennsylvania Law, Mastery claims that it was obligated to disenroll

R.B.—regardless of either her Special Education status or the dispute between the Parties—

because R.B. had been absent for ten consecutive days.[82]  Mastery shifts the blame for R.B.'s dis-

enrollment from itself to Parent, and claims that "[i]t was not Mastery that precluded the student's

---

[77] Honig, 484 U.S. at 323;  George A. v. Wallingford Swarthmore Sch. Dist., 655 F. Supp. 2d 546, 552 (E.D. Pa. 2009).

[78] Cronin, 689 F. Supp. 197, 203; B.A.W. v. East Orange Bd. of Education, No. 10-4039, 2010 WL 3522096 (D.N.J. Aug. 31, 2010) (letter opinion) ("The following key factors are indisputed . . . graduation constitutes a change in placement.").

[79] Drinker, 78 F.3d at 864.

[80] Pl.'s Mem. Law in Supp. of Mot. for Mandatory IDEA "Stay Put" Pendency Inj. at 8–9 (doc. no. 2).

[81] Reply of Mastery Charter Sch., Pickett Campus, to Pl.'s Mot. in Opp. to Def. Mastery Mot. to Dismiss, 1 (doc. no. 20) ("Mastery Reply").

[82] 22 Pa. Code § 11.24 (a school must drop from enrollment any student who has 10 consecutive days of absence, unless the absences are legally excused).

attendance, it was the parent."[83]  In addition, Mastery argues that R.B.'s disenrollment was only a "change in location" and not a change in educational placement.

Because this Court now holds that Mastery's unilateral disenrollment of R.B. was a change in placement, it need not decide herein the highly controverted issue of whether R.B.'s Parent was a "fundamental part" of R.B.'s program—or whether Mastery actually barred Parent from its campus.  That said, if Mastery required Parent to make an appointment with an administrator in order to bring R.B. to school and situate her in the classroom every time a TSS worker was absent, they created an impossible situation.  The record establishes that R.B.'s educational program as-implemented accommodated R.B.'s inability to independently arrive at school and situate herself in her classroom.  Given the need for expedient decision-making in the context of a injunctive hearing, however, and the availability of an alternate grounds upon which our decision may rest, we decline to undertake that inquiry, which is better suited for the due process proceedings.

The decision to disenroll R.B., however, is a different matter.[84]  Although the question of whether a disenrollment constitutes a change in placement is a matter of first impression, principles drawn from the body of law governing disciplinary-based exclusions and graduations provide a useful analytical framework.  In both graduation and disciplinary exclusion cases, any change in a special education child's placement must comply with the procedural safeguards—regardless of what outcome state or local laws might dictate for a special education student's non-disabled

---

[83] Mastery Reply at 2.

[84] Notably, 22 Pa. Code § 711.61(c) directs that "[a]ny removal from the current educational placement is a change of placement for a student who is identified with mental retardation."

peers.[85]

For instance, the disciplinary removal of a student with a disability is construed as a change in placement, and may require a school to evaluate the student, conduct a team meeting, propose an alternate special education plan, and provide special education services pending an agreed upon placement.[86] Similarly, courts have held that graduation is a "change in placement" which triggers

---

[85] Chief among these requirements is that a school must provide "written prior notice" to the parents of a child, whenever the local educational agency proposes to change a child's educational placement. 20 U.S.C.A. § 1415 (b)(3). "Subsection (c)(1) specifies that the notice required must contain a description of the proposed agency action, an explanation of why the agency proposes to take the action, and a description of the agency's bases for taking such action, and a statement notifying the parents that they have due process rights under IDEA to challenge such an action. A parent must be given an opportunity to present a complaint 'with respect to any matter relating to the identification, evaluation, or educational placment of the child, or the provision of a free public education to such a child." Comb v. Benji's Special Educ. Academy, Inc., --- F. Supp. 2d ---, No. 10-cv-3498, 2010 WL 4065486 (S.D. Tx. Oct. 15, 2010).
    Although Defendants presented three letters that were sent to parent prior to R.B.'s disenrollment, it not clear to the Court that those letters meet the rigorous standards IDEA establishes for prior written notice. However, the Court need not reach the merits of Plaintiff's due process claim. In the context of a stay-put injunction, the sole inquiry is whether a change in educational placement has occurred. See Drinker, 78 F.3d at 864–65.

[86] Students with disabilities who violate the code of student conduct may be removed to an appropriate interim alternative placement, another setting, or suspended for no more than 10 school days (so long as these are the same standards for students without disabilities). 20 U.S.C.A. § 1415(k)(1)(B). Where removal for more than 10 days is sought and the behavior is not related to the disability, the school may apply the same disciplinary procedures it would to students without disabilities, except that the school remains obligated to provide educational programming in an alternative educational setting. 20 U.S.C.A. § 1415(k)(1)(C) & (D). School personnel now have the authority to assign a student to an appropriate interim alternative setting, or suspend a student for not more than ten school days without a due process hearing, as long as the same alternative would be applied to a student without a disability. 20 U.S.C.A. § 1415(k)(1)(A).
    The IEP team must meet to determine if the student's disciplinary infraction was a manifestation of the child's disability. The right to a so-called "manifestation determination" is granted by 20 U.S.C.A. §1415(k)(a) of the IDEA:

>  Except as provided in subparagraph (b), within 10 school days of any decision to change the placement of a child with a disability because of a violation of a code of student conduct, the local education agency, the parent, and relevant members of the IEP Team (as determined by the parent and the local educational agency) shall review all relevant information in the student's file, including the child's IEP, any teacher observations, and any relevant information provided by the parents to determine . . . (I) if the conduct in question

the protections of the stay-put provision. In <u>Cronin v. Board of Education</u>,[87] the court analogized graduation to long-term suspensions and expulsions because both "result[ed] in total exclusion of a child from his or her educational placement."[88] Noting that "[n]o change in placement seems quite so serious nor as worthy of parental involvement and procedural protections as the termination of placement in special education," the Court found that a student's removal from his high school program by graduation during the pendency of proceedings violated the stay-put provision.[89] Like a graduation, indefinite suspension, or expulsion, the unilateral disenrollment of a special education student, which results in the absolute termination of a child's special education program, and purportedly the termination of a LEA's responsibility to deliver FAPE, is a change in placement.

Although R.B.'s disenrollment was not necessarily a disciplinary action, it was precipitated by R.B.'s chronic absenteeism. The record—which includes letters authored by Mastery—provides ample documentation that R.B.'s disability and medical condition frequently caused her to miss school, and that Mastery modified R.B.'s schedule to accommodate her individual needs.[90] As the agency responsible for administering R.B's educational program,

---

was caused by, or had a direct and substantial relationship to, the child's disability; or (II) if the conduct in question was the direct result of the local educational agency's failure to implement the IEP.

[87] 689 F. Supp. 197 (S.D.N.Y. 1988).

[88] <u>Id.</u> at 203.

[89] <u>Id.</u>

[90] Def. Mastery Exs. 12, 13, 14 (stating that "[w]e recognize that your daughter's disability could cause school absences and we want to work with you to support your daughter's education and support her unique needs"); Pl. Ex. S-40.

Mastery arguably had an affirmative duty to respond to the absences—potentially caused by R.B.'s disability—through educational intervention.[91]  If R.B.'s absences were caused by Mastery's policy choice to require Parent to make an appointment in order to visit the school, Mastery was obligated to provide alternate arrangements so that R.B. could consistently get to school and to her classroom.  If every school was able to rid itself of a problematic special education student or her parent by treating them exactly the same as a non-disabled student, as Mastery has done here, the protections of IDEA would be eviscerated.

Finally, Mastery's argument that this was merely a "change in location" is not compelling.  It is true, as Mastery claims, that "the stay-put provision of the IDEA is not construed so narrowly as to mandate the student remain in the exact physical location where he or she was schooled at the time the dispute arose."[92]  The LEA may, in its discretion, make changes in the physical location of a child's program, if it does not significantly affect the student's program.[93]  But although LEAs

---

[91] See Springfield Sch. Comm. v. Doe, 623 F. Supp. 2d 150, 159 (D. Mass. 2009) (finding that once a special education student's truancy became excessive, and where the absenteeism was a documented aspect of the student's disability, the School had an affirmative duty to take some sort of responsive action, such as reconvening the student's IEP team).

[92] George A., 655 F. Supp. at 550.

[93] See, e.g., Lunceford, 745 F.2d at 1582 (no change in educational placement where District switched student from residential program in a private hospital to a public institution); Tilton v. Jefferson County Bd. of Educ., 705 F.2d. 800, 804 (6th Cir. 1983) (transfer from one school to another school with comparable program is not a change in educational placement), cert. denied, 465 U.S. 1006 (1984); Concerned Parents & Citizens for Continuing Educ. at Malcolm X (PS 79) v. New York City Bd. of Educ., 629 F.2d 751, 754 (2d Cir. 1980) (transfer from one school to another within same district with similar but less innovative programs not a change in educational placement within meaning of the IDEA), cert. denied 449 U.S. 1078 (1981); Union Beach Bd. of Educ., 2009 WL 4042715 at *4 ("one-to-one instruction as opposed to a small group resource room does not constitute a 'fundamental change, or elimination of' [the student's] educational placement"); Henry, 70 F. Supp. at 57 (finding that proposed IEP moving student from private middle school to public high school fundamentally altered child's educational placement when he became too old for the middle school).

may exercise discretion over how and where they implement a student's IEP, their primary

obligation to implement the IEP remains.[94]  At the time Mastery improperly disenrolled R.B., it

was—pursuant to its charter and state law—responsible for providing a FAPE to R.B; and as the

party that effected the allegedly unlawful change in placement during the pendency of judicial

proceedings, that responsibility continues.  Mastery's argument, that when it disenrolled R.B. the

responsibility to provide a FAPE to R.B. shifted automatically to the School District of

Philadelphia, has no support in fact or in law.[95]  Case law does not present a single ruling where an

LEA's responsibility for delivering FAPE to an individual student was vitiated simply by closing

its doors to that student.[96]  Even where a child's then-current educational placement is simply no

longer available, the LEA retains responsibility for providing the student with placement in a

similar program during the pendency of proceedings.[97]

 The line of cases relied on by Mastery are inapposite, because most "program not

---

[94] See Roselle Park Bd. of Educ., 2006 WL 3193915 at *11 (holding that a school district is responsible for providing comparable services during the pendency of legal proceedings in order to comply with the IDEA).

[95] During the hearing, the Court asked Mr. Kurtz, the former Assistant Principal of Special Education and Student Services at the Mastery Charter School Pickett Campus, what precautions he took to ensure that Mastery complied with IDEA when disenrolling R.B.  In reply, Kurtz stated that "at the time R.B. was dropped it was annotated in the school computer network, so that when the school district checked their enrollment they would check, number one, Mastery no longer had this student.  Number two, that the student was then counted as unassigned within the district's own record keeping for students."  Even if Mastery were able to transfer its responsibility for R.B.'s education to the District, these precautions are clearly insufficient to notify the School District that it was now responsible for R.B.'s education—particularly because the attendance notification would not be reflected on the rolls until August, 2009.

[96] In contrast, closing an educational facility to *all students* for budgetary reasons does not always constitute a change in educational placement under the stay-put provision.  See Concerned Parents, 629 F.2d at 754; Tilton, 705 F.2d at 804.

[97] Knight v. Dist. of Columbia, 877 F.2d 1025, 1029 (D.C. Cir. 1989); McKenzie v. Smith, 771 F.2d 1527, 1533 (D.C. Cir. 1985).

placement" cases involve proposed changes of schools or classrooms (over which the LEA retains responsibility). Without exception, each case in which the court stresses the importance of program over placement arises where a LEA proposes an inter-district transfer between classes or schools. There is no case where an LEA has successfully cited "program over placement," to justify its refusal to fulfill its responsibilities under FAPE where no alternative location has been provided by the school district for IEP program implementation. Here, Mastery claims that because the District has similar programming options available for R.B., the District then assumes responsibility for R.B.'s educational placement.

Mastery's attempt to evade its obligations under the IDEA by passing the buck—in this case, a special-needs student's education—to the District is troubling. As a Charter School, Mastery is bound by all the obligations of IDEA.[98] Children with disabilities who attend public charter schools and their parents retain all rights under IDEA and its regulations—a body of laws which were enacted to "strip schools of the *unilateral* authority they had traditionally employed to exclude disabled students, from school."[99] Indeed, the sole purpose of the stay-put provision is to "prevent[] local educational authorities from unilaterally changing a student's existing educational program."[100]

Mastery is correct in asserting that state law provides that a student must be disenrolled after ten consecutive absences. But that law does not exist in a vacuum; because R.B. is a student

[98] See 22 Pa. Code § 711, *et seq.* (mandating that charter schools assume the duty to ensure that children with disabilities enrolled in their school receive a free and appropriate public education, and incorporating all of the procedural safeguards set forth in the IDEA).

[99] Honig, 484 U.S. at 323; See 34 C.F.R. §300.503(a)(2006); 22 Pa. Code § 711 (charter schools situated within public school districts are distinct and separate LEAs).

[100] Michael C., 202 F.3d at 650.

eligible for special education, Pennsylvania Education Code and the IDEA are also applicable. And to the extent that IDEA might conflict with that state law, it prevails under the Supremacy Clause of the Constitution.[101] Ultimately, Mastery's legal position is untenable. If Mastery seeks to remove her, it must follow the IDEA— it cannot unilaterally expel her from her educational placement during the pendency of proceedings.[102] We therefore conclude that R.B.'s removal from Mastery in June 2009 violated the stay-put provision of the IDEA because proceedings were initiated by the Parent in April 2009 remained pending at that time and the disenrollment constituted a change in placement.

3.    *R.B's Current Educational Placement*

Mastery implausibly argues that it was not R.B.'s then-current educational placement at the

_____

[101] See George A., 665 F. Supp. at 552 ("To the extent Defendants rely on Pennsylvania law . . . such a law does not grant [the district] permission to violate the IDEA."). Although the Court is not required to reach the merits of Parent's claim, the numerous procedural protections which Mastery potentially ignored include the rights of parents and students to receive advance notice of any change in placement, 34 C.F.R. § 300.503(a)(1), an opportunity to discuss the School's proposal with the student's team, 34 C.F.R. § 300.345 and to consent to or challenge the School's proposed change, 34 CFR §300.504.

[102] Under the statute, "proceedings" refers to "administrative and judicial proceedings." 20 U.S.C. § 1415(j); see also Drinker, 78 F.3d at 863–64; Verhoeven v. Brunswick Sch. Comm., No. 98-2348, 1999 WL 721698, at *5 (1st Cir. Sept. 21, 1999). Parent filed her first Complaint in this case on May 13, 2009, claiming that because she was not allowed to escort her daughter to school, R.B was unable to attend Mastery. Ballard v. Sch. Dist. of Phil. and Mastery Charter Sch., No. 09-1627 (doc. no. 3). R.B. was dropped from enrollment on June 19, 2009. Therefore, judicial proceedings were ongoing at the time Mastery disenrolled R.B. Notably, the summons in that case were not returned executed until July 29, 2010—after the date when R.B. was disenrolled. But as previously noted, a May 12th email between Mastery staff noted their awareness of ongoing "legal action" by Parent. See Pl. Ex. S-40. Further, the plain language of 1415(j)—which refers only to "the pendency of any proceedings"—and makes no reference to the Parties' notice of such proceedings, along with Congress's intent to protect children with disabilities from unilateral exclusion of school, makes Mastery's notice of the ongoing proceedings irrelevant.

time she was disenrolled.[103]  "Because the term [stay-put] connotes preservation of the status quo, it refers to the operative placement actually functioning at the time the dispute first arises."[104]  If an IEP has been implemented then that program's placement will be the one subject to the stay-put provision."[105]

As this Court has noted, Mastery's argument that location is not synonymous with program is unpersuasive; as R.B.'s LEA, Mastery bears ultimate responsibility for ensuring that R.B.'s program is implemented.  Mastery's argument that location is not a component of "educational placement" is not compelling.[106]  While "as a general matter, the location of the services is not conclusive in determining what constitutes the educational placement of the student," the physical location of services "cannot be entirely divorced from the inquiry."[107]  Instead, "'[t]he meaning of 'educational placement' falls somewhere between the physical school attended by a child and the abstract goals of a child's IEP.'"[108]  In George A., the District Court rejected Defendant's argument that the location of services was irrelevant, and acknowledged student's "extensive history" at a

---

[103] Drinker, 78 F.3d at 867 (quoting Thomas v. Cincinnati Bd. of Educ., 918 F.2d 618, 625–26 (6th Cir. 1990)).

[104] Id.

[105] Drinker, 78 F.3d at 867; see also Union Beach Bd. of Educ., 2009 WL 4042715 at *4 (looking to the last functioning IEP when the dispute arose to determine the student's "current educational placement"); West Orange Board of Education,  2001 WL 1715787, at *4.

[106] See Comb, 2010 WL 4065486 at *10 (compiling cases and concluding that the "case law does not establish a per se rule that a 'change in location' does not constitute a 'change in placement' under IDEA'").

[107] George A., 655 F. Supp. at 550.

[108] Union Beach Bd. of Educ., 2009 WL 4042715 at *5 (quoting Cmty. High Sch. Dist. No. 218 v. Ill. State Bd. of Educ., 103 F.3d 545, 548 (7th Cir. 1996)); see also Roselle Park Bd. of Educ., 2006 WL 3193915 at *10.

particular school as relevant to the determination of his current educational placement.[109] Similarly, in <u>M.K. & R.K v. Roselle Bd. of Education</u>, factors including the distance between classrooms, available facilities, and physical location were relevant to the determination of then-current educational placement.[110]

Here, we find that Mastery's location is relevant to R.B.'s educational placement. As Parent testified, Mastery's proximity to R.B.'s home (essentially across the street) mitigated R.B.'s difficulty getting to school, and provided needed access to R.B.'s doctor's office in the case of medical emergency.[111] In addition, Mastery is a small school, which R.B. is able to navigate because of her familiarity with the location.[112] Finally, Mastery provided R.B. with instruction in very small classes, where she was given "lot[s] of individual attention."[113]

Since R.B. was attending Mastery at the time the dispute arose, and because Mastery's learning support program is R.B.'s identified placement in the most recent IEP, dated October 28, 2009, R.B.'s current educational placement is Mastery Charter School, Pickett Campus. Although the extent to which parent was a component of R.B.'s program remains unclear on this record, Mastery must continue to accommodate R.B.'s physical needs and ensure that R.B. is able to get to school and situate herself in the classroom. If that no longer entails permitting Parent to bring R.B. to school when a TSS is unavailable, Mastery is responsible for making alternative arrangements.

---

[109] <u>George A.</u>, 655 F.Supp. at 551.

[110] <u>Roselle Park Bd. of Educ</u>., 2006 WL 3193915 at *13.

[111] Hr'g Tr. 47, Dec. 16, 2010.

[112] <u>Id.</u> at 47.

[113] Hr'g at 90, Dec. 17, 2010.

CONCLUSION

For all the reasons detailed above, Mastery must immediately reinstate R.B.'s enrollment during the pendency of the state proceedings, unless Mastery officials and Parent agree on a satisfactory alternative arrangement.

Based on the foregoing discussion, the Court will GRANT Plaintiff's Motion for a Preliminary Stay-Put Injunction. Since Plaintiff's Complaint is solely for injunctive relief, and because the Court has found Plaintiff's complaint meritorious, Mastery's Motion to Dismiss is DENIED. However, the Court finds that Plaintiff has failed to sufficiently allege a claim for relief against the School District of Philadelphia. Accordingly, the School District's Motion to Dismiss is GRANTED on 12(b)(6) grounds.

An appropriate Order follows.